1

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY - CIVIL TERM - PART 3
----------------------------------------X
RICHARD DAVIMOS, JR.,

        PLAINTIFF,

  -against-

JOHN HALLE,

        DEFENDANT
----------------------------------------X

Index No. 111013/02    60 Centre Street
Proceedings             New York, New York
                          May 15, 2013

B E F O R E:

    HONORABLE EILEEN J. BRANSTEN,
Justice

A P P E A R A N C E S:

    DAMIAN J. PIETENZA, ATTORNEY AT LAW
    Attorneys for the Plaintiff
    7703 Fifth Avenue
    Brooklyn, New York 11209


    KARAM NAHAS, ATTORNEY AT LAW
    Attorneys for the Plaintiff
    1130 Route 202 South, Suite A-7
    Raritan, New Jersey 08869


    MCLANE, GRAF, RAULERSON & MIDDLETON
    Attorneys for Defendant
    900 Elm Street P.O. Box 326
    Manchester, New Hampshire 03105-0326
        BY: SCOTT H. HARRIS, ESQ.

    THOMAS M. LANCIA, PLLC
    Attorneys for the Defendant
    22 Cortlandt St. 16th floor
    New York, New York 10007



                Angela Bonello, RPR, Sr. Court Reporter

Proceedings

THE COURT: All right, I have before me the matter of Richard Davimos, Junior against John Halle. For the plaintiff Richard Davimos, Junior, I have Damian J. Pietanza.

MR. PIETANZA: That's correct, Your Honor.

THE COURT: And assisting but not admitted to practice law in the State of New York is Karam Nahas.

MR. NAHAS: Yes, Your Honor, that's correct. Good afternoon.

THE COURT: Good afternoon. Are you planning to be admitted pro hoc vice?

MR. NAHAS: Not at this time, maybe down the road.

THE COURT: Then sit down and don't have anything to do with this.

MR. NAHAS: Yes, Your Honor.

THE COURT: Because if you want to talk you have to be admitted pro hoc.

MR. NAHAS: I understand, Your Honor, thank you.

THE COURT: Then for John Halle, I have from the law firm McLane, Graf, Raulerson & Middleton, from Manchester, New Hampshire, are you admitted to practice law in the State of New York?

MR. HARRIS: I am.

THE COURT: You are Thomas Lancia?

Angela Bonello, RPR, Sr. Court Reporter

1                           Proceedings
2          MR. HARRIS:  I'm Scott Harris.
3          MR. LANCIA:  I'm Thomas Lancia.
4          THE COURT:  And you are from?
5          MR. LANCIA:  My own firm, Thomas Lancia, PLLC.
6  It's my own firm.
7          THE COURT:  What's your address?
8          MR. LANCIA:  22 Cortland Street.
9          THE COURT: Yes, I see it.
10         MR. LANCIA: I'm sorry for the sloppy handwriting.
11         THE COURT:  And Mr. Harris is from Manchester,
12 New Hampshire.  Are you admitted to practice law in the
13 State of New York?
14         MR. HARRIS:  I am, Your Honor.
15         THE COURT: All right, good.  So, you're an attorney
16 in good standing in New York?
17         MR. LANCIA: I checked.
18         THE COURT:  All right, good, I'm glad you checked
19 that way I don't have to worry about it.
20         All right, it is the Halle's motion.  These papers
21 are really, they are totally up to snuff, Commercial
22 Division style.  What we have here is basically the order to
23 show cause telling the plaintiff Richard Davimos to come to
24 Court so I can vacate my judgment.  It is a disgrace, all
25 right.  It fell apart on me, you'll be glad to know I had to
26 put it back together for you guys.  So you know paper clips

                Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 14:53 FAX 2123455711   Case 2:13-cv-00225-JCN   Document 6-1 REPRODUCTION   Filed 08/06/13   Page 4 of 15   PageID #: 72

4

Proceedings

don't do it, backs do do it in the State of New York. If you're printing papers or you're giving courtesy copies indexes are very important. You do have indexes, so that is good and I'm glad that both of you realize that at least in this part I definitely like table of contents and table of authorities.

So, we have that, the proposed order to show cause, and this supported I read these papers this morning supported by the full transcript of the bench trial that occurred before Justice Karla Moskowitz, followed by, we had the legal service bill, followed by my-- this is me being Eileen Bransten, memoranda, decision on the bench trial, a written decision followed by at Exhibit K the Appellate Division First Department's affirmance of my decision; right?

MR. HARRIS: Right.

THE COURT: Now, by the way, just so we get some time table here, that decision by the First Department is dated March 31st, 2009. This is 2013 so four years have gone by, four years and basically six weeks, right, I just want to make sure I get that right.

The claim to vacate the decision is based on, I didn't get the impression it was newly found, but, certainly newly claimed, that's maybe what the proper word is, newly claimed perjurious testimony; am I correct on that?

Angela Bonello, RPR, Sr. Court Reporter

5

                         Proceedings

MR. HARRIS: Correct.

THE COURT: Tell me where, what and when the perjurious testimony occurred.

MR. HARRIS: At trial, Your Honor.

THE COURT: At the trial?

MR. HARRIS: At the trial.

THE COURT: Where? Show me, give me the page number.

MR. HARRIS: So, Your Honor, we've by way of context, Your Honor, the case rested on a question of whether this was a continuing guarantee or not. And so, if you take a look at the first Appellate Division decision --

THE COURT: Then Justice Moskowitz, and by the way Justice Moskowitz is not here, the first occurred in 2007, you then went to a trial after the 2007 reversal and then you went to trial and that occurred on November 26, 2007. Then, everybody should be happy to know, approximately December 20th of 2007, I believe it was Governor Patterson appointed Justice Moskowitz to be a Justice of the Appellate Division First Department. So that's exactly what she did. So she spent the intervening period of time, you'll be happy to know, all of her happy holidays that everybody else was galavanting around, she was here writing as much as she could. But the one thing she couldn't get to and she didn't know if she had a complete record was indeed the decision

                         Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 16:54 FAX 2129259741    SOHO REPROGRAPHICS                    ☐006
Case 2:13-cv-00225-JCN   Document 6-1   Filed 08/06/13   Page 6 of 15   PageID #: 74

6

1  Proceedings
2  after trial based on the trial transcript.
3       So, go ahead.
4       MR. HARRIS: So, the critical issue at trial was
5  whether or not the guaranty was with respect to a loan. And
6  the reason that I point to the first Appellate Division
7  decision is because it framed what the question was, the
8  critical question and it framed it as follows: "Whether the
9  unpaid note is the one referred to in the guaranty and
10 whether the loan terms were changed or replaced in such a
11 manner that the deal was never consummated and the guaranty
12 rendered null and void." So the critical question at trial
13 was --
14      THE COURT: By the way you are admitted to
15 practice; right? Okay go ahead.
16      MR. HARRIS: The critical question at trial was,
17 Your Honor whether this loan that was guaranteed in December
18 of 2007 was changed materially thereafter and the way that
19 the plaintiff sought to get around that is the testimony
20 that I am about to refer you to, that we've referred you to
21 in the motion, and that is that because the loan was
22 renegotiated with Mr. Davimos's counsel and not executed
23 until four months after the guaranty was signed, the way
24 that the plaintiffs dealt with that is to say, well, it was
25 John Halle who was responsible for all aspects of the
26 architecture of this loan and advising the plaintiff as to

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 14:53 FAX 2128250741          SOHO REPROGRAPHICS                    ☑007
Case 2:13-cv-00225-JCN   Document 6-1   Filed 08/06/13   Page 7 of 15   PageID #: 75

7

Proceedings

1  
2   its terms and conditions.
3           That simply wasn't true, Your Honor, and the --
4           THE COURT:  But sir, that was known to Mr. Halle
5   at the time that he was here and testified at trial.  And it
6   was known to Mr. Halle at the time that the Court rendered a
7   written decision in 2008.  And it was known to Mr. Halle
8   whatever his claims are, nothing has changed from that
9   particular time to when indeed the argument was had before
10  the Appellate Division, and had there been any claim that
11  there was misrepresentation could have been said at that
12  time because they do listen to that kind of argument and
13  indeed, it was found that Mr. Halle didn't raise it.  Either
14  he knew about it and didn't raise it or decided it wasn't
15  important, whatever his decision was.
16          MR. HARRIS: He knew, because he knew what he said
17  to the plaintiff.  What he didn't know is that he had the
18  ability to prove that what Mr. Davimos was testifying to was
19  false.  The billing records of Henry --
20          THE COURT: Sir, sir, I really -- you know, this
21  Court does not redo things, all right.  There's nothing, I
22  mean, Mr. Halle had an opportunity to testify, am I correct,
23  at the trial?
24          MR. HARRIS: He did, yes.
25          THE COURT: And he certainly had the opportunity to
26  be redirected after the cross examination of Mr. Halle;

Angela Bonello, RPR, Sr. Court Reporter

```
 1                        Proceedings
 2    right?
 3            MR. HARRIS: What he couldn't show, though, Your
 4    Honor, is that because Mr. Davimos was saying it is
 5    Mr. Halle who told me about this transaction. The fact is
 6    Mr. Davimos was told about the transaction by his lawyer,
 7    and when Mr. Halle tried on cross examination to --
 8            THE COURT: But wait a second, wait a second.
 9    Mr. Halle was told of this transaction by his lawyer. Who
10    was his lawyer, at that time?
11            MR. HARRIS: Mr. Davimos was told about the
12    transaction by his lawyer.
13            THE COURT: By his lawyer, so --
14            MR. HARRIS: Because that is, that was the crux of
15    why it was -- because Your Honor, if Mr. Halle is the one
16    whose telling Mr. Davimos about the transaction, if
17    Mr. Halle is the one who is the architect of the
18    transaction, then the Courts, the trial Courts and the
19    Appellate Division's decision which was that this was an
20    integral, uniform transaction is supported because Mr. Halle
21    would have had to have known about the change in the terms
22    and the conditions. And so, it was the same loan then that
23    Mr. Halle guaranteed. View it otherwise, though, Your
24    Honor, let's just assume that it is --
25            THE COURT: Isn't it a fact that Mr. Halle really
26    doesn't want to have to pay the judgment that's against him?
```

Angela Bonello, RPR, Sr. Court Reporter

9

Proceedings

Isn't that the issue; isn't that really the issue that in fact there's a statement in here, this doesn't go forward he may have to declare bankruptcy?

MR. HARRIS: He's not declaring bankruptcy, Your Honor.

THE COURT: Not now because he thinks he's going to win on this.

MR. HARRIS: He's an investment banker so he's not declaring bankruptcy.

THE COURT: Good, then maybe he will have to pay the judgment.

MR. HARRIS: So, Your Honor, you asked me originally so where is the testimony that's perjurious. The critical question was whether Mr. Halle engineered the transaction or whether this transaction was --

THE COURT: So show me the perjurious statement and statements, cross examination, direct, cross examination and redirect.

MR. HARRIS: So the cross examination was cut off because when Mr. Halle's counsel endeavored --

THE COURT: That was for the argument to be made at the Appellate Division: I didn't have a chance, they had to produce by evidence, Justice Moskowitz cut me off and I didn't have an opportunity. So come to me with that.

What is the perjurious statement?

Angela Bonello, RPR, Sr. Court Reporter

1           Proceedings
2           MR. HARRIS: If you look at page 50 of the
3    transcript, which appears at tab G there's a question.
4           THE COURT: Right here, where?
5           MR. HARRIS: Line six.
6           THE COURT: Its says:
7           "QUESTION: -- this is cross examination of the
8    defendant Mr. Davimos by which lawyer?
9           MR. HARRIS: By Mr. Sullivan who was Mr. Halle's
10   counsel at the time.
11          THE COURT: Right, Mr. Sullivan was hailed from
12   New Hampshire, Exeter, New Hampshire and you hail from
13   where?
14          MR. HARRIS: Manchester.
15          THE COURT: Manchester, New Hampshire.
16          MR. HARRIS: Yes.
17          THE COURT: Is that far away from each other?
18          MR. HARRIS: Not particularly, 20 minutes.
19          THE COURT: Do you know Mr. Sullivan personally?
20          MR. HARRIS: I do.
21          THE COURT: And have you discussed it with
22   Mr. Sullivan?
23          MR. HARRIS: I have discussed this case at length
24   with him, yes.
25          THE COURT: You have, good.
26          Page 50, line six:

Angela Bonello, RPR, Sr. Court Reporter

11

Proceedings

1
2  "QUESTION: So, how do you know what the terms of
3  the deal was?
4  "ANSWER: I know exactly what John Halle told me.
5  "QUESTION: You knew nothing else?
6  "ANSWER: Nothing else.
7  "QUESTION: Nothing from your lawyer?
8  "ANSWER: Nothing.
9  "QUESTION: Nothing?
10 "ANSWER: Nothing.
11 "QUESTION: Nothing from Gerald Green?"
12 Who is Gerald Green?
13 MR. HARRIS: He was the principal of the phone
14 development company that is at issue.
15 THE COURT: All right, continuing:
16 "ANSWER: Nothing.
17 "QUESTIION: He didn't send you letters?
18 "ANSWER: There were no letters and I would
19 never -- I would never have seen before I sent money
20 regarding the terms of the deal."
21 And it goes on. So that's the critical thing;
22 right?
23 MR. HARRIS: Yes.
24 THE COURT: Anything else?
25 MR. HARRIS: Well, I think you need to pair that, to
26 understand why we believe that that's perjurious, you need

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 16:58 FAX 2129259741    SOHO REPROGRAPHICS
Case 2:13-cv-00225-JCN   Document 6-1   Filed 08/06/13   Page 12 of 15   PageID #: 80

12

Proceedings

to look at Exhibit H and Exhibit C because --

THE COURT: Exhibit H is the time table from the law firm of the Weissman, Wolff, Bergman, Coleman & Silverman and there we have legal services rendered through December 31, 1999, and it goes on and on.

And what do you want me to see there?

MR. HARRIS: So, Your Honor, the contention is that Mr. Davimos learned about and understood this transaction solely from Mr. Halle. It's important, because if --

THE COURT: I got that. What do you want me to see here?

MR. HARRIS: So, if you look at the bottom of the page.

THE COURT: Which page, the first page?

MR. HARRIS: First page, yes, 12/14/99 is the entry.

THE COURT: Right.

MR. HARRIS: It says: "Reviewed agreements, telephone calls to and from Richie Davimos, telephone call to John Davimos, Henry Holmes." Then if you look on the second page there are four entries that refer to the same type of conduct, review of the documents.

THE COURT: And that, you think makes it perjurious?

MR. HARRIS: There's more, Your Honor. So the loan documents are all reviewed, and then on March, in March there's an entry.

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 16:58 FAX 2129259741   SOHO REPROGRAPHICS
Case 2:13-cv-00225-JCN   Document 6-1   Filed 08/06/13   Page 13 of 15   PageID #: 81

13

1        Proceedings
2        THE COURT: When did you get hold of this document, sir?
3
4        MR. HARRIS: This was FAXed to CMC Capital in the
5    year 2001 and it was capped with all of the FAXes that came
6    in and we discovered it last August.
7        THE COURT: Good, but it was a available to you had
8    you made a demand for that kind of documents prior to the
9    trial; am I correct on that, yes or no? Yes or no?
10       MR. HARRIS: Technically, yes. Technically yes,
11   except they were claiming attorney-client privilege, Your
12   Honor so.
13       THE COURT: But you did not --you didn't say, you
14   know, look, this is a, there's no doubt in reviewing the
15   documents this involves the financing of a movie deal and
16   people knew each other and they knew each other fairly well.
17   In fact, there was no doubt that John Halle wanting money
18   from Richard Davimos, Junior sent him a million dollars, and
19   on a basis of friendship, mind you, certainly knew that John
20   Davimos to the degree that he knew, in fact he did ask for
21   attorney, the attorney records. And you have, if you
22   thought there was that kind of interplay between the partner
23   Henry Holmes and Mr. Davimos, certainly, a question either
24   before or anytime and saying, you know, where is Mr. Holmes,
25   I would like to talk to Mr. Holmes because Mr. Holmes may
26   have been involved in this. You didn't do that.

          Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 16:59 FAX 2129259741    SOHO REPROGRAPHICS    ☒014
Case 2:13-cv-00225-JCN    Document 6-1    Filed 08/06/13    Page 14 of 15    PageID #: 82

14

Proceedings

MR. HARRIS: But Your Honor, again, in 2000 -- that was not an issue until Mr. Davimos testified falsely.

THE COURT: No, it was not -- sir, you know, that goes to credibility. Let's assume for a second that in 1997, right, I had a conversation with my lawyer, it happens, I'm entitled to have a conversation with my lawyer; right?

MR. HARRIS: Absolutely.

THE COURT: And that's an attorney-client relationship. Now, let's fast forward, so that is in 1999 -- was it 1999? Let me see, yes, 1999. In December of 1999 practically 2000, seven years later I'm on the witness stand and a lot of things are going on since then, many, many discussions, many, many, many motions, many, many things have happened and now I'm questioned.

I have to take this phone call, excuse me. I'll go in the back.

(Whereupon, a brief recess was taken.)

(Record resumed.)

THE COURT: Thank you. Please be seated. I'm sorry.

MR. HARRIS: You were asking me about if --

THE COURT: Right, so now basically seven years later I'm now on the witness stand and somebody asks me did you have any conversations, and I say no, I didn't, it's on

Angela Bonello, RPR, Sr. Court Reporter

Proceedings

the same topic, but no, I didn't and that could very well be his memory. And had you brought up, you mean that you didn't, you know, didn't you talk to so and so; that would have gone to his credibility, but it would not go to a perjury. Yes, he was under oath, but that is something that goes to his credibility and not to a material fact in the matter.

MR. HARRIS: But we differ of course, Your Honor.

THE COURT: I know we do.

MR. HARRIS: But it's, you know, and from our perspective, though, it's a critical fact and that is that it is material --

THE COURT: It is material now that it's another five years.

MR. HARRIS: But, you see, the question isn't did you have a conversation. The question is very specific and actually it starts, this series, this exchange starts on page 48. I won't bother you with reading it line by line but they ask Mr. Davimos about his representation by counsel, so that doesn't just come out of the blue.

And the question on page 48, line ten is:

"QUESTION: Let me ask you again, all right, it's an easy question. Yes or no, did Henry Holmes, the lawyer in California right, did he represent you?

"ANSWER: Yes.

Angela Bonello, RPR, Sr. Court Reporter