Case 2:13-cv-00225-JCN   Document 6-2   Filed 08/06/13   Page 1 of 12   PageID #: 84

EXHIBIT
A - Part 2

15

Proceedings

the same topic, but no, I didn't and that could very well be his memory. And had you brought up, you mean that you didn't, you know, didn't you talk to so and so; that would have gone to his credibility, but it would not go to a perjury. Yes, he was under oath, but that is something that goes to his credibility and not to a material fact in the matter.

MR. HARRIS: But we differ of course, Your Honor.

THE COURT: I know we do.

MR. HARRIS: But it's, you know, and from our perspective, though, it's a critical fact and that is that it is material --

THE COURT: It is material now that it's another five years.

MR. HARRIS: But, you see, the question isn't did you have a conversation. The question is very specific and actually it starts, this series, this exchange starts on page 48. I won't bother you with reading it line by line but they ask Mr. Davimos about his representation by counsel, so that doesn't just come out of the blue.

And the question on page 48, line ten is:

"QUESTION: Let me ask you again, all right, it's an easy question. Yes or no, did Henry Holmes, the lawyer in California right, did he represent you?

"ANSWER: Yes.

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 14:00 FAX 2129259741   SOHO REPROGRAPHICS   Case 2:13-cv-00225-JCN   Document 6-2   Filed 08/06/13   Page 2 of 12   PageID #: 85

16

Proceedings

"QUESTION: He represented you with regard to the documentation of this deal?

"ANSWER: No."

Okay, and then there's a series, then there is an objection as to attorney-client privilege, so we're not allowed to go into that. And the question is not did you have a conversation with Henry Holmes, the question is how do you know what the terms of the deal was.

THE COURT: But, sir let's get down to basics, right. Mr. Davimos got up one day and he gave Mr. Holmes Halle a million dollars; am I right?

MR. HARRIS: He gave it to Total Film Group.

THE COURT: But the guaranty was Mr. Halle. You said no matter what, no matter if we have writing or no writing, I am going to pay, pay you back Davimos my friend; right?

MR. HARRIS: No, quite to the contrary, Your Honor. I think the facts show --

THE COURT: I don't know the facts that well on the case.

Let me hear from you on the other side.

MR. HARRIS: Can I just follow up very quickly?

THE COURT: No, you got your point and very voluminous sections, of course not bound or anything, but voluminous things, here.

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 14:03 FAX 2128259741  SOHO REPROGRAPHICS
Case 2:13-cv-00225-JCN   Document 6-2   Filed 08/06/13   Page 3 of 12   PageID #: 86

17

Proceedings

MR. PIETANZA: With respect to the materiality of the billing statements they're immaterial, they don't show anything. They show that Mr. Davimos had an attorney and what they actually show, and Mr. Halle testified to is that he had spoken to Mr. Holmes, he had a meeting with Mr. Holmes. Mr. Halle on the first page identified Mr. Halle in his law firm as parties who had knowledge of this matter and documentation regarding this matter and this all goes to the whole point Your Honor made this morning, Mr. Halle made these points at trial, Mr. Halle knew about Mr. Holmes's involvement in this matter for 13 years, now, he chose to do nothing about it. At trial he subpoenaed Mr. Murphy who was another attorney out of Washington, D.C., he could have similarly done that, and called Mr. Holmes as a witness.

THE COURT: Did Mr.-- did that other gentleman, Murphy did he testify?

MR. PIETANZA: He testified at a deposition in this matter. Nonetheless, Mr. Halle knew about Mr. Holmes, he's now claiming that these billing records show something which they don't show. All they show is that they were telephone conversations. Mr. Halle testified on pages 81 and 91 and 92 at trial, he testified that he spoke to Mr. Holmes, he testified that he met with Mr. Holmes.

Where is the news? What are these documents, run

Angela Bonello, RPR, Sr. Court Reporter


Proceedings

to us, what do they show that's different than before? Nothing. They show that Mr. Holmes was there. They don't show that Mr. Davimos didn't rely on John Halle.

In fact, they don't show anything, and they don't substantiate anything other than the facts which Mr. Halle only already knew at the time.

He didn't raise it at trial, he raised it at various --

THE COURT: Yes, at page 89 that started line 11:

"QUESTION: Rich Davimos was present in that meeting through a teleconference, was he not?

"ANSWER: Correct, yes.

"QUESTION: What was the purpose of the meeting?

"ANSWER: In attendance with Michael Murphy, John Davimos, Gerald Green, Henry Holmes, and Richard's other attorney that worked for Henry Holmes, I forget the name, and the idea was to paper, make the changes and paper the correct transaction.

"QUESTION: So the transaction that was thought about earlier didn't happen?

"ANSWER: That is correct."

This is Mr. Halle testifying.

MR. PIETANZA: And just to add to that, Your Honor, defendants keep making reference to the first Appellate Division decision. This matter came back, it was

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 17:02 FAX 2129259741 SOHO REPROGRAPHICS
Case 2:13-cv-00225-JCN    Document 6-2    Filed 08/06/13    Page 5 of 12    PageID #: 88

19

Proceedings

on trial, it went back up a second time to the Appellate Division and it was affirmed. And in its decision, the Appellate Division held it was a continuing guaranty, end of story.

They're coming back here for another bite at the apple which they shouldn't be permitted to do. They haven't acted with any diligence. They admit to having these documents last August. It's May, why didn't they do something last August? I'll tell you why, it's our belief that the only reason we're here today is because we domesticated the balance in Mr. Halle's home state of Maine and he's looking to stall, delay and hinder our efforts to collect the damages. We commenced proceedings in Maine because that's where it is, that's clearly what they're attempting to do here.

THE COURT: Have you collected anything on this judgment?

MR. PIETANZA: $30,000. In fact in their reply papers the last paragraph they admit and concede that they have no respect for the finality of judgments. In the last paragraph of their reply papers they say, if this Court doesn't vacate the judgment we're moving forward with another lawsuit based on our claims of recoupment. That case is going to be coming to you because we just filed a motion to dismiss that case, which based on the same

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 17:03 FAX 2122525741    SOHO REPROGRAPHICS
Case 2:13-cv-00225-JGN   Document 6-2   Filed 08/06/13   Page 6 of 12   PageID #: 89

20

Proceedings

grounds, the same allegations, it's res judicata, statute of limitations, and quite frankly, it's frivolous.

We've asked for sanctions in that motion. We didn't have time to do that here, but I'm going to bring to the Court's attention, and I already brought these cases to the defendant's attention. Your Honor has made a couple of decisions in various cases, one is the Capogrosso matter and I have copies of those decisions here, and another is Kasab v TRC.

THE COURT: Yes, I did do sanctions in that one.

MR. PIETANZA: In both of those cases the litigant wants to establish they have no respect for the finality of the judgement and they kept coming back and back and back, and that's what they're doing here. And they admit in this case that if they're not successful here they're going to try it another way. They admit in that case, that case is moot if you were to vacate their judgment here which you shouldn't.

Your Honor is clearly familiar with the law and has clearly familiarized herself with the arguments here. There's nothing new. For the same reasons they couldn't move under 15(a)(2) they can't move under 1515(a)(3), they didn't act with any semblance of diligence. When they did this they knew this at trial they raised the argument at trial, they lost. They knew it on appeal, they raised the

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 14:03 FAX 2129250741    SOHO REPROGRAPHICS
Case 2:13-cv-00225-JCN    Document 6-2    Filed 08/06/13    Page 7 of 12    PageID #: 90

21

Proceedings

argument on appeal, they lost. Now they're claiming they only know about it last August, nine months he waited to act, if that's in fact the case.

I would submit to the Court that Mr. Halle's excuse for not bringing up these billing records, which in fact show nothing at all is entirely unbelievable and lacks any merit.

THE COURT: I think it's good, just for the record, so that the record is clear here, that on March 31st, 2009, the Appellate Division wrote as follows, it was a unanimous decision: "The evidence at trial overwhelmingly demonstrated that the defendant's personal guarantee Total Film Group's otherwise known as TGF corporate guarantee, TGF president Gerald Green's personal guarantee, and TGF subsidiary 1st Mister's promissory note to plaintiff for $1 million, all executed the same day, December 20, 1999, were part of the same transaction. The evidence showed that defendant actively participated in the deal; knew the loan amount to be for $1 million; agreed to guarantee the loan because he knew plaintiff would not loan money without his guarantee; and received a $50,000 commission in connection with arranging the loan. Green testified that the $1 million note dated December 20, 1999, was in return for plaintiff's investment in 1st Mister and was the note referenced in the corporate guarantee executed December 20, 1999. The fact

Angela Bonello, RPR, Sr. Court Reporter

Proceedings

that the guarantees all reference a December 17, 1999, note is of no moment in light of the foregoing.

Furthermore, as noted by the trial court defendant's guarantee was a continuing one. A guarantor is bound by an anticipatory agreement in his undertaking that will not be relieved of liability by a modification of the principal contract." And it has a citation.

"Thus, even assuming arguendo, that the parties intended that their guarantees to refer to the "unsigned note" as defendant alleges, rather than the December 20, 1999 note simultaneously executed, their guarantees would nonetheless extend to the executed note because they were continuing." Based on the foregoing we affirm, all right.

Now, I don't need to take this in for a massive writing, it's not necessary. I don't believe that the perjurious statements made in the trial transcript stating that no, I did not, no I did not consult with the attorney is, I think, of no moment because it was certainly something that was part and parcel of the argument that was made before Justice Moskowitz and that this Court considered when indeed it rendered the written decision based on the trial that Justice Moskowitz heard. The Court was not there, obviously, for the issue of credibility but from reading the transcript with care did come to credibility conclusions based on the language of the actual trial transcript. And I

Proceedings

think that it's particularly interesting when you try to tell this Court oh, you know, Mr. Halle had no knowledge of anything when there was communications between Mr. Davimos and the attorney, when indeed there was a teleconference where not only was Mr. Halle involved but that attorney was involved and I go back to what I just read before. What page was that?

MR. PIETANZA: 89, I believe, Your Honor.

THE COURT: Where Mr. Halle was testifying on cross examination and stated that what was the purpose of the meeting he doesn't answer that, he says.

"ANSWER: In attendance with Michael Murphy, John Davimos, Gerald Green, Harry Holmes."

Henry Holmes being the attorney in question where Mr. Davimos had a lapse of memory saying:

"No, I did not talk to him. And Richard's other attorney that worked for Henry Holmes, I forgot his name, and the idea was to paper, make the changes and paper the correct transaction."

Now, that allows this Court to conclude that Mr. Holmes way back in 1999, you have the communications between the attorneys and the principals involved, that's number one, knew that Mr. Davimos was there and knew when Mr. Davimos was testifying that indeed, Mr. Davimos either had a lapse of memory, or -- a lapse of memory and answered

Angela Bonello, RPR, Sr. Court Reporter

24

Proceedings

the question:

"Did you have a communication with Mr. Holmes?"

"No, I did not."

A few pages later that's at page 50 in the transcript, 39 pages later, Mr. Holmes says, oh, yeah, we knew that, because John Davimos and Holmes were on this telephone conference with me, Mr. Halle. So we all knew who was involved. And he can't come now all these years later, five years after Appellate Division First Department's decision -- well, we'll put it this way, let's get right dates. Five years after this Court's decision on April 3, 2008, based on the trial testimony and four years after the Appellate Division's affirmance of this Court's decision in March 31st, 2009, and come and say to this Court, oh, you know Mr. Davimos perjured himself, he perjured himself when he answered these questions, when it was clear that Mr. Halle, that sat in the same Courtroom as Mr. Davimos, clear that Mr. Halle knew that Mr. Davimos was on the same phone call as Mr. Holmes and in fact it was no news to him because he was there, too.

So, this motion to vacate the decision that was made after a full day bench trial, the decision that was written by this Court in 2008 and the decision of the Appellate Division First Department that reviewed everything and in fact you included, you included as part of your

Angela Bonello, RPR, Sr. Court Reporter

05/23/2013 17:36 FAX 0225250741    SOUE REPRODUCTIONS     [@025
Case 2:13-cv-00225-JCM   Document 62   Filed 08/26/13   Page 11 of 12   PageID #: 94

25

Proceedings

documents Mr. Holmes's -- no, this was a brief of the plaintiff respondent, that led to the judgment of the Court.

Sir, this has been well litigated, well, well litigated and there is nothing that has been brought to this Court's attention that was not known at the time the trial was had that was not known shortly thereafter by Mr. Sullivan, your colleague from New Hampshire; you say you talked to him at length, it's not known to Mr. Sullivan during the course of the trial and certainly could not have been brought to everybody's attention in a post trial memoranda, and any other vehicle that is appropriate at the time of the trial.  So, your motion to vacate the decision is denied and that constitutes the decision and order of the Court.

You will get me the transcript and I will write you a gray sheet on it it which is an appealable order.

MR. PIETANZA:  Your Honor may I just make a statement for the record?

THE COURT: Yes, of course.

MR. PIETANZA:  Unfortunately, because of the defendant's conduct it seems that we're going to be before Your Honor again.

THE COURT: All right you have to speak up.

MR. PIETANZA:  Unfortunately, because of the defendant's repetitive and vexatious conduct, in our opinion

Angela Bonello, RPR, Sr. Court Reporter

Proceedings

it seems that we're going to appear before this Court again for our motion to dismiss and sanctions. I wanted to note for the record I've already provided counsel with an opportunity to withdraw that, I'm hoping we don't have to appear, and I will leave that invitation open for them, just to make a clear record for them.

THE COURT: They will do what they think is best and of course they will suffer the consequences if indeed it turns out not to be in their best interest to have done that.

So, you will consider it. No use coming if you don't want to be subject to potential sanctions.

C E R T I F I C A T E

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

*[signature]*

ANGELA BONELLO
SENIOR COURT REPORTER
SUPREME COURT-NEW YORK COUNTY

Angela Bonello, RPR, Sr. Court Reporter