UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

RICHARD DAVIMOS, JR.,
    Plaintiff
V.                                Case No. 2:13-CV-00225-GZS
JOHN HALLE' and
SHARON HALLE',
    Defendants

VIDEOTAPED DEPOSITION of JOHN R. HALLE', taken pursuant to notice dated November 21, 2013, at the law offices of Marcus, Clegg & Mistretta, P.A., One Canal Plaza, Portland, Maine, on December 5, 2013, commencing at 10:05 a.m., before Kimberly B. Arsenault, RPR, a Notary Public in and for the State of Maine.

APPEARANCES:

For the Plaintiff:      LEE H. BALS, ESQ.
                        JENNIE L. CLEGG, ESQ.
                        KARAM NAHAS, ESQ.
                        DAMIAN J. PIETANZA, ESQ.

For the Defendants:     MARGARET M. O'KEEFE, ESQ.

DUVERNAY REPORTING, INC.
2 Merrill Road
Westbrook, Maine 04092
207.854.2721

---

INDEX
Deponent: JOHN R. HALLE'
  Examination by:                   Page
    Mr. Bals                        4

EXHIBITS
(Exhibits Retained by Attorney Bals.)
Number   Description                            Page
23       Articles of Organization for Jenis      38
         Holding Company, LLC
25       Town of Scarborough Property Tax        65
         Bill
26       Settlement Statement for Woodlands      87
         Drive Property
27       Hunter Point Drive Purchase Documents   89
28       Letter                                  116
29       Bill of Sale                            135
30       Article of Dissolution                  149
31       Affidavits                              150

---

STIPULATION

It is hereby agreed by and between the parties that signature is not waived.

- - - - -

VIDEOGRAPHER: We are now recording and on the record. This is the deposition of John Halle'. The date is December 5th, 2013 and the time is 9:09 a.m.. This deposition is taking place at One Canal Plaza, Portland, Maine.

Could I please have counsel state your appearances for the record then the court reporter will swear in the witness. Thank you.

MR. BALS: My name is Lee Bals, and I represent the plaintiff Richard Davimos, Jr.. Again, I'm here with Jennie Clegg, Karam Nahas, Damian Pietanza and also Mr. Davimos is present at the deposition.

MS. O'KEEFE: And I'm Margaret Minister O'Keefe, and I'm counsel for the defendants John and Sharon Halle'.

- - - - -

---

JOHN R. HALLE', having been duly sworn by the Notary Public, was examined and deposed as follows:

EXAMINATION

BY MR. BALS:

Q. Could you state your full name for the record, please?
A. John R. Halle'.
Q. Mr. Halle', have you -- when you say John R. Halle', have you gone by any other names?
A. So John Raymond and then John is English for Jean, which is -- I'm French. So Jean is my real name and I go by the name John.
Q. So what is your legal name?
A. That's a good question. My driver's license says John, my passport says Jean.
Q. All right. Have you ever been deposed before?
A. Yes, I have.
Q. How many occasions?
A. I can't recall how many occasions. Just a couple of months ago I got deposed on a divorce case.
Q. So let me -- let me just make sure I understand. You don't know how many times you've been deposed before?
A. That's correct.
Q. Can you estimate for me?

**Page 9**

```
 1     3 -- 1, 2 and 3 so far.
 2  Q. You know what, I'm going to -- I -- I don't need
 3     you to go through that exercise.  If you've seen
 4     those two, that's enough.
 5  A. Okay.
 6  Q. But let's -- while you're looking at that, let's
 7     take a look -- if you would, please take a look
 8     at Exhibit No. 2.  That's the complaint in this
 9     case.  Before you reviewed the exhibit last night
10     I presume, because you said that was one you had
11     reviewed --
12  A. Mm-hm.  Mm-hm.
13  Q. -- had you seen this document before?
14  A. Yes.
15  Q. All right.  When was the first time you saw this
16     document?
17  A. I think when it was filed --
18  Q. All right.
19  A. -- or it was shortly thereafter.
20  Q. And you read that document?
21  A. Yes, I have.
22  Q. Okay.  And if you take a look, Mr. Halle',
23     Exhibit No. 3 is a copy of the answer to the
24     complaint that your attorney has filed on your
25     behalf in this case.  And my question is other
```

**Page 10**

```
 1     than your review last night had you seen that
 2     answer before?
 3           MS. O'KEEFE:  Objection.  Foundation.
 4  Q. You can answer.
 5  A. I'm -- I think so, yes.
 6  Q. Okay.  If you take a look at Exhibit No. 2, Mr.
 7     Halle', and you look at Page 3, there is a
 8     reference about a quarter of the way down the
 9     page to a company known -- or called Jenis
10     Holding Company, LLC.  Do you see that?
11  A. Yes, I do.
12  Q. Are you familiar with the company Jenis Holding
13     Company, LLC?
14  A. Yes, I am.
15  Q. And if you look in that pile of documents that
16     you have in front of you Exhibit No. 17.  I'd
17     like you to take a look at that.  Take your time.
18     I don't want to rush you.
19  A. Thank you.
20  Q. My question for you is -- while you're looking at
21     that is have you seen that document before?
22  A. No.
23  Q. You saw it when you reviewed the -- you didn't
24     see that when you reviewed exhibits last night?
25  A. No, I didn't see this one when I reviewed the
```

**Page 11**

```
 1     exhibits last night.
 2  Q. All right.  And -- and now I just want to be
 3     clear of your answer.  You've never seen this
 4     document before?
 5  A. No.  I thought the question was have I seen it
 6     last night.
 7  Q. No.  Not -- my question is have you ever seen it
 8     before?
 9  A. I'm sure I have, yeah.
10  Q. Why are you sure?
11  A. I think my signature is attached to it, so...
12  Q. Well, if you look at Page 2 --
13  A. Yes.
14  Q. -- at the top, is that your signature?
15  A. Correct.
16  Q. And there is -- you -- there is a block that has
17     a signature block.  That's your signature there?
18  A. Yes.
19  Q. Below that it says print or type name.  And
20     that's your name John R. Halle', correct?
21  A. Correct.
22  Q. Below that do you see where there is a line that
23     says title?
24  A. Yes.
25  Q. And do you -- below -- do you see where there is
```

**Page 12**

```
 1     written in, it looks like it's handwritten, the
 2     word member?
 3  A. Yes.
 4  Q. Okay.  Do you know whose handwriting that is?
 5  A. No.
 6  Q. Do you recognize it as your handwriting?
 7  A. No.
 8  Q. If you look at the last page of the document --
 9  A. Mm-hm.  Mm-hm.
10  Q. -- do you see that's an addendum to business
11     organization and registration form?
12  A. Mm-hm.
13  Q. Have you seen that document before?
14  A. Yes.
15  Q. Is that your signature at the bottom of that
16     document?
17  A. Yes.
18  Q. Do you understand or do you -- do you know if
19     this document was filed with the State of New
20     Hampshire?
21  A. I don't know.  I can only make the assumption
22     here.  There is a State of New Hampshire sticker
23     here, so I have a feeling that it was.
24  Q. Do you know when Jenis Holding Company, LLC was
25     created?
```

**Page 13**

1  A. No.
2  Q. Do you see, if you look at the complaint, Exhibit
3     2, Paragraph 12 on Page 3?
4  A. Yes.
5  Q. Do you see where Paragraph 12 says on December
6     13th, 2006 Jenis Holding Company, LLC was formed
7     as a Florida limited liability company?
8  A. Yes.
9  Q. Do you see that?
10 A. Yes, I do.
11 Q. And if you look at the corresponding paragraph
12    and the answer, which is Exhibit 3 -- could you
13    do that for me?
14 A. Yes. Which page?
15 Q. It's going to be Page 2, Paragraph 12. Are you
16    there?
17 A. Yep.
18 Q. Do you see where your counsel Paragraph 12 it
19    says defendant admits the allegations contained
20    in Paragraph 12 of the complaint?
21 A. Correct.
22 Q. So do you know if Jenis Holding Company, LLC was
23    formed as a Florida limited liability company?
24        MS. O'KEEFE: Objection. Foundation and
25    form.

**Page 14**

1     You may answer.
2  Q. Well, that's my question. Do you know if Jenis
3     Holding Company, LLC was formed as a Florida
4     limited liability company?
5  A. Yes.
6  Q. Okay. Why was it -- do you know why it was
7     formed as a Florida limited liability company?
8  A. No, I don't recall why we would have filed that
9     as a -- as a Florida corporation.
10 Q. When you say we, who is the we you're referring
11    to?
12 A. So -- you know, so the way the -- our affairs are
13    managed, you know --
14 Q. Who is our?
15 A. So my wife, the companies and --
16       MS. O'KEEFE: Let's let the witness
17    finish the answer before --
18 Q. I didn't mean to interrupt, so you go ahead.
19 A. So --
20 Q. So I was asking -- my question for you is who is
21    the we you're referring to, but I'm also -- you
22    also referred to our. So who is the we and our
23    you're referring to in your previous answer?
24 A. So, you know, I manage a bunch of funds and I
25    manage a bunch of companies and I have a staff, I

**Page 15**

1     have lawyers and these documents are put in front
2     of me, you know, left and right and I'm asked to
3     sign then. And at the end of the day they make
4     the decisions -- the attorneys make the decision
5     of where we file the corporations, whether they
6     be Florida, Delaware, New Hampshire, Maine. So
7     I'm not involved in that decision making process.
8     I take their advice. When I pay an attorney, I
9     usually take their advice. And so things are put
10    in front of me and -- you know, and I'm told
11    where to sign and under what capacity to sign.
12 Q. Were you involved in any way in the decision to
13    form Jenis Holding Company, LLC?
14 A. I would assume I was, yes.
15 Q. When you say assume, I'm not sure what you mean.
16 A. Well, Jenis stands for John, Nicholas and Sharon,
17    so, you know -- so it's -- you know, I would have
18    been involved in the formation of the company;
19    yes.
20 Q. Okay. So who decided to form a company called
21    Jenis Holding Company, LLC?
22 A. So the -- the attorneys would have advised, you
23    know, to form this corporation.
24 Q. Well, which attorney?
25 A. So I employee an awful lot of attorneys. You

**Page 16**

1     know, Mark Sullivan is one, I have a full staff
2     at Pierce Atwood, I have a full staff at McLane.
3     There is -- there is -- you know, I deal with an
4     awful lot of attorneys.
5  Q. Okay. That wasn't my question.
6        My question --
7  A. I -- I think I --
8  Q. Let me finish my question.
9  A. Okay.
10 Q. My question for you is do you know which attorney
11    was involved in the formation of Jenis Holding
12    Company, LLC?
13 A. I think, you know, the -- the answer is no.
14 Q. Okay. And what -- do you know what the purpose
15    of Jenis Holding Company, LLC was?
16 A. The purpose of Jenis Holding Company was to hold
17    assets and I think at the time we were involved
18    in mortgage banking business and -- so I think
19    this -- to the best of my recollection it never
20    had any real assets, so -- I can't really recall,
21    you know, that far back out.
22 Q. I just want to see if I can unpack that answer.
23       Do you know what assets Jenis Holding
24    Company, LLC held at any time?
25 A. So I know that Jenis Holding, LLC right now owns

### Page 17

1      a Ford Taurus 2012.
2 Q. I'm getting ahead of myself, but there is some
3      documents that I have been provided --
4 A. Mm-hm.
5 Q. -- that indicates that Jenis Holding Company, LLC
6      has been dissolved.
7 A. I think that the Jenis Holding, LLC in Florida
8      has been dissolved and then was re-filed in New
9      Hampshire. That's to the best of my knowledge.
10 Q. Well, I'm -- I'm interested in this LLC in
11      Florida.
12 A. Mm-hm.
13 Q. Do you -- were you aware that that had been
14      dissolved?
15 A. No, I was not aware until we started the research
16      in this litigation.
17 Q. Okay. So let's go back -- I want to go back
18      to -- first of all, you don't know the attorney
19      that was involved with the formation, correct?
20 A. I can't recall which attorney was involved in
21      that formation.
22 Q. Did you play a role in the decision to form that
23      company?
24          MS. O'KEEFE: Objection. Asked and
25      answered.

### Page 18

1 A. Yes.
2 Q. And -- and the reason I ask that, Mr. Halle',
3      is -- I mean, in my experience typically an
4      attorney doesn't come to a client and say let's
5      form an LLC. Usually the client goes to the
6      attorney and says I need to create a corporation.
7      So do you know if you went to an attorney and
8      said I want to create this particular company?
9          MS. O'KEEFE: I'm -- I'm going to object
10      on foundation and form grounds. I'm also
11      going to object on the basis of attorney/
12      client privilege.
13          If you were seeking legal advice or
14      obtaining legal advice from an attorney,
15      please don't testify as to the contents of
16      that. Otherwise you may answer.
17 A. In -- in our business we do it differently. So
18      in our business -- you know, I have attorneys
19      that review what we do, you know, and -- and they
20      advise us of what to do as far as forming
21      corporations and -- and the like. So everything
22      that -- that -- that -- all of the corporations
23      have been formed have been formed at the -- at
24      the advice of counsel. And -- and I would say
25      that, you know, in almost all instances, you

### Page 19

1      know, it -- it was at their urging that these
2      corporations were -- were formed.
3 Q. All right.
4          MR. BALS: Margaret, if they're going to
5      be relying on advice of counsel with respect
6      to this, I'm going to be asking to -- to
7      invade the privilege in terms of what counsel
8      was advising. That's the advice of counsel
9      defense. And I've been through this with the
10      Federal Court before. I'm entitled to make
11      inquiry. If his answer is basically we
12      relied on counsel for -- for creating, if it
13      was their decision, I get to know that.
14          MS. O'KEEFE: Well, I understand that
15      issue very well. I don't think that entitles
16      you to know every detail of every
17      communication between counsel and -- and the
18      client. If we're talking about a factual
19      matter about the purpose for setting up the
20      Jenis Holding Company, that's something that
21      Mr. Halle' can testify to without waiving any
22      attorney/client privilege.
23          MR. BALS: All right. Well, let's take
24      it on a case -- I mean a question-by-question
25      basis.

### Page 20

1 Q. Do you know the purpose of setting up this Jenis
2      Holding Company, LLC?
3 A. It's to -- you know, to be honest with you, I
4      don't even recall why Jenis Holdings was put
5      into -- into effect. So -- so I can't recall
6      that. And that's the best answer I can give you.
7 Q. Who -- do you know how we -- do you know where we
8      would be able to find any information as to why
9      it was created?
10 A. I mean, there are corporate books and -- and
11      that -- that tell who the members are and the
12      like, but the intent, you know, of forming a
13      corporation -- I mean, you know, in the past 10,
14      12 years, you know, we do four, five, six, seven,
15      eight, nine of them a year. So, I mean --
16 Q. Who is we?
17 A. So, you know, I run a company called Cate Street
18      Capital and we form corporations on a monthly
19      basis. And -- so, you know, the exact nature or
20      why -- you're talking -- you're asking me to go
21      back to 2006 and remember why I formed a
22      corporation that had little or no assets. So
23      it -- it was not a very important thing in my
24      mind so it's not something that stuck in my
25      memory.

**Page 21**

1  Q. Well, is Cate Street Capital associated in some
2     fashion with Jenis Holding Company, LLC?
3  A. No. I'm just telling you that -- that -- that,
4     you know, I'm involved on a daily basis in
5     forming corporations, in handling those kinds of
6     matters. And so to try to go back to 2006 and
7     2007 and try to figure out why this specific
8     corporation was formed and what was the intent at
9     the time -- you know, we're very transactional so
10    it's tough to recall that stuff. You know,
11    maybe, you know, if I get, you know, another
12    couple hours -- maybe if you ask this question at
13    the end of the day, then I might be able to
14    remember why. But at this instance I don't.
15 Q. All right. But I want to come back to -- just to
16    be clear, you said -- I think, if I understood
17    what you're saying -- and I'm not meaning to
18    mischaracterize your testimony -- Cate Street
19    Capital forms companies all the time, right?
20 A. That's correct.
21 Q. Did Cate Street Capital have some role in the
22    formation of Jenis Holding Company, LLC?
23 A. No, it hasn't.
24 Q. Okay. So who -- who did? I mean, other than
25    the -- it being the attorneys who were involved

**Page 22**

1     whose -- at whose direction was this company
2     created?
3        MS. O'KEEFE: Again, I'm inserting the
4     privilege. I understand your question to be
5     other than the attorneys.
6        MR. BALS: Right.
7        MS. O'KEEFE: You may answer.
8  A. Other than attorneys. I would say just, you
9     know, myself and Sharon. I mean, like I said,
10    Jenis stands for John, Nicholas and Sharon. John
11    and Nicholas are my sons and Sharon is my wife.
12    I think you met her yesterday. So those -- you
13    know, so my assumption if -- you know -- and,
14    again, this is an assumption, is that me and
15    Sharon, you know, discussed, you know, where to
16    park my car or I think there was a boat that
17    was -- that was parked in there a couple of years
18    ago. And so I think that that was the -- the
19    intent of the corporation is to put cars and --
20    and assets like that into that corporation.
21 Q. Your personal assets?
22 A. Not my personal assets.
23    MS. O'KEEFE: Objection. Calls for a
24    legal conclusion.
25    You may answer.

**Page 23**

1     MR. BALS: Wait. It calls for a legal
2     conclusion? I'm just asking him if your --
3     if the intent of the company was to put his
4     personal assets in the company.
5  A. You know, the -- go ahead.
6     MS. O'KEEFE: I'm objecting because
7     you're using a term personal assets.
8     MR. BALS: Okay.
9  Q. You can answer.
10 A. So the -- you know, so they -- they -- you know,
11    personal assets would be if we -- if you want to
12    define personal assets, would be assets that
13    belonged to me or to Sharon; is that correct?
14 Q. Yes.
15 A. Is that -- is that the question?
16    So, no, those assets, you know, belonged to
17    somebody else and we purchased them and put them
18    in that corporation.
19 Q. Okay. For example, I think, if I understood you,
20    you originally --
21    MR. BALS: Strike that.
22 Q. I believe earlier in your testimony you said
23    something to the effect of you weren't sure what
24    assets may have been in the company.
25 A. Correct.

**Page 24**

1  Q. You have mentioned a boat.
2  A. Mm-hm.
3  Q. And there is a boat that I'm familiar with called
4     Anger Management. Are you familiar with a boat
5     called Anger Management?
6  A. Correct, I am.
7     MS. O'KEEFE: Objection. Form.
8  Q. Do you know where that boat is today?
9  A. I think it's in Rhode Island.
10 Q. And is it -- it's moored in Rhode Island you
11    believe?
12 A. I don't know if it's moored or it's in dry
13    storage or if it's docked, but it's in Rhode
14    Island.
15 Q. At one time did Jenis Holding Company, LLC
16    acquire that boat?
17 A. Yes.
18 Q. When?
19 A. 2006, something like that. 2007.
20 Q. Well, according to the admission in the answer --
21 A. Mm-hm.
22 Q. -- Jenis Holding Company, LLC was formed in
23    December -- on December 13th, 2006.
24 A. Mm-hm.
25 Q. Do you agree with me then that the boat was

**Page 29**

| | | |
|---|---|---|
| 1 | | Company, LLC for use of the boat? |
| 2 | | MS. O'KEEFE: Objection. Foundation. |
| 3 | | Form. |
| 4 | | You may answer. |
| 5 | A. | I -- Cate Street would pick up the gas or -- or, |
| 6 | | you know, the -- you know, they would pick up the |
| 7 | | gas, the cheese and crackers, the beer, you know. |
| 8 | | You know, this is not a commercial, you know -- |
| 9 | | you know, charter here. |
| 10 | Q. | Would you use it personally? |
| 11 | A. | Of course. |
| 12 | Q. | How frequently? |
| 13 | A. | So Sharon and I, you know, we're -- like I said, |
| 14 | | we're avid boaters, so we would use it -- you |
| 15 | | know, the summer is short here in Maine, but I |
| 16 | | would say, you know, three or four times a month. |
| 17 | Q. | Who owns the boat now? Do you know? |
| 18 | A. | It was sold to a third party couple. |
| 19 | Q. | When? |
| 20 | A. | It would be a year ago, maybe two years ago. |
| 21 | Q. | What -- |
| 22 | A. | A year ago. |
| 23 | Q. | What was the boat sold for? |
| 24 | A. | I think it was sold for 122,000, something like |
| 25 | | that. |

**Page 30**

| | | |
|---|---|---|
| 1 | Q. | Where did the proceeds from the sale go? |
| 2 | A. | So they would have gone to John -- Jenis |
| 3 | | Holdings. |
| 4 | Q. | Okay. And where did those proceeds go after |
| 5 | | Jenis Holdings Company, LLC was dissolved? |
| 6 | A. | I don't know. That -- that's a good question. |
| 7 | Q. | Thanks. I've got a number of them. |
| 8 | | Do you know where -- are there records that |
| 9 | | would show where the money went? |
| 10 | A. | There has got to be records. I didn't get |
| 11 | | paid -- it didn't get paid in cash so there has |
| 12 | | got to be a check somewhere and it shows where it |
| 13 | | got deposited. |
| 14 | Q. | Did Jenis Holding Company, LLC have its own bank |
| 15 | | account? |
| 16 | A. | I would assume so, yeah. |
| 17 | Q. | Why do you assume that? |
| 18 | A. | I don't know. Again, you know, you're talking |
| 19 | | about an awful lot of entities here. And, you |
| 20 | | know, it's not that I have personal knowledge of |
| 21 | | all of this, you know. You've -- you deposed |
| 22 | | Mr. Desrosiers, you've deposed my wife. There |
| 23 | | is -- there is a lot of people involved in this. |
| 24 | | To -- to say that I'm at the top of the heap and |
| 25 | | I control and know everything is -- you know, is |

**Page 31**

| | | |
|---|---|---|
| 1 | | a grave mistake because it's not a fact. |
| 2 | Q. | I didn't say that. And I was only asking you |
| 3 | | about one company right now, Jenis Holding |
| 4 | | Company, LLC, Mr. Halle'. |
| 5 | A. | It's the -- it's the fourth -- fourth time, sir, |
| 6 | | you ask me questions about things that, you |
| 7 | | know -- |
| 8 | Q. | What other assets, if you know, did Jenis Holding |
| 9 | | Company, LLC own? |
| 10 | A. | None that I know or that I recall. |
| 11 | | MS. O'KEEFE: Do you need more water? |
| 12 | | THE DEPONENT: No. I'm good. Thank |
| 13 | | you. |
| 14 | Q. | I have heard from your attorney that there was |
| 15 | | some mistake made with respect to your name |
| 16 | | appearing on documents that indicate you were a |
| 17 | | member of Jenis Holding Company, LLC. Do you |
| 18 | | have some knowledge about some mistake as to how |
| 19 | | your name came on this -- on -- on, for example, |
| 20 | | Exhibit 17? |
| 21 | A. | As -- as I, I think previously testified, people |
| 22 | | put documents in front of me and tell me what to |
| 23 | | sign as a capacity. But I can tell you that I've |
| 24 | | never been, you know, a member or I've never |
| 25 | | owned an interest, personal interest in Jenis |

**Page 32**

| | | |
|---|---|---|
| 1 | | Holdings. |
| 2 | Q. | Okay. That wasn't quite my question though. |
| 3 | A. | That's the way I phrase my answers. |
| 4 | Q. | Do you know -- okay. And so let me ask |
| 5 | | another -- |
| 6 | A. | It's a free country. So I get to -- |
| 7 | Q. | Relatively. Let me -- let me try the question -- |
| 8 | | another question -- |
| 9 | A. | Sure. |
| 10 | Q. | -- because -- so maybe my question -- my question |
| 11 | | was probably a bad one, and I apologize to you. |
| 12 | A. | That sounds -- |
| 13 | Q. | So let me try again. |
| 14 | A. | It sounds good. |
| 15 | Q. | Do you -- have you had discussions with anyone |
| 16 | | outside your counsel, for example -- well, even |
| 17 | | including counsel before this litigation was |
| 18 | | initiated about some mistake on documents for |
| 19 | | Jenis Holding Company, LLC and the mistake being |
| 20 | | you're listed as a member? |
| 21 | | MS. O'KEEFE: I'm going to object to any |
| 22 | | communications with counsel that you had |
| 23 | | about a mistake. |
| 24 | | I understand we'll have this dispute |
| 25 | | later, but I'm going to instruct him not to |

**33**

```
 1     answer with respect to any communications
 2     with counsel about a mistake, but otherwise
 3     you may answer.
 4  A. It's described as a mistake. There is no way.
 5     I've never held any ownership in -- in Jenis
 6     Holdings --
 7  Q. How do you know --
 8  A. -- end of story.
 9  Q. Sorry. Finish your answer. I apologize.
10  A. No, no problem.
11         And -- and I've had discussions -- you know,
12     when that's been brought up to my attention, I've
13     had discussions with that and we have a
14     compliance officer, you know, the general counsel
15     at the time. And, again, you know, these
16     documents are put in front of me and, you know,
17     I've got a busy day. I run -- I run around a
18     lot. I've got a lot of work to do. People put
19     documents in front of me and say these need to be
20     executed and you sign under -- okay. And so I
21     sign and I ask under what capacity am I signing
22     and they tell me and I sign it.
23  Q. All right.
24  A. But I can tell you for a fact I've never held any
25     interest in Jenis Holding ever. Not from day one
```

**34**

```
 1     and not in the middle and not -- and not today.
 2  Q. How do you know -- why do you know that? How do
 3     you know that?
 4  A. Because, you know, the -- the corporate documents
 5     are fairly simple and there is no ownership.
 6     There was no stocks. There is an operating
 7     agreement, which you have a copy of. There is no
 8     -- no stock that was ever transferred to me.
 9  Q. I don't have a copy of the operating -- there is
10     an operating agreement?
11  A. There has to be. You can't file a corporation --
12     you're an attorney. You can't file a corporation
13     without filing the operating agreement.
14     MR. BALS: All right. Well, Margaret, I
15     have a request for production of documents
16     that I sent to you. I asked for all
17     documents concerning Jenis Holding, LLC. I
18     don't have an operating agreement, I don't
19     have any records from the sale of the boat --
20     boat or that show any -- or the purchase of
21     the boat or that show any of the funds that
22     were provided.
23     MS. O'KEEFE: Okay. Understood. We'll
24     look into it.
25     MR. BALS: So -- but I want to be clear
```

**35**

```
 1     on the record that I am reserving the right
 2     to reconvene this deposition with those
 3     documents to ask him specific questions about
 4     those.
 5     MS. O'KEEFE: Understood. We will look
 6     into it. I thought we had turned over the
 7     Jenis Holding's operating agreement. I see
 8     now we have the JH North Hampton Group and
 9     the -- and 70KC operating agreements, but I
10     will look into that and we'll get back to
11     you. Hopefully we'll get those to you today.
12     MR. BALS: Okay. If you don't, do you
13     agree I can reconvene this deposition to make
14     inquiry about those since that's a pending
15     document request?
16     MS. O'KEEFE: Well, I can't agree
17     without knowing whether or not you've already
18     obtained those documents elsewhere in which
19     case then we would object. And if they're
20     publicly available, then we would also
21     object. I understand the boat purchase would
22     not be.
23     MR. BALS: Well, I'm going to represent
24     to you I have not -- I do not have the
25     operating agreement nor do I believe that
```

**36**

```
 1     would be publicly available. But that's not
 2     my bailiwick in the law. So I don't have
 3     those documents. I'm going to make that
 4     representation to you. If I had them, I
 5     wouldn't play games. I would take them out
 6     right now and ask him questions about those.
 7         So I do -- I want to be clear though, I
 8     just don't want there to be some
 9     misunderstanding, that if those -- those
10     documents exist and they are not produced
11     today, I want the ability to come back, bring
12     him here under oath and ask him questions
13     about those.
14     MS. O'KEEFE: Understood.
15     MR. BALS: All right. And --
16     MS. O'KEEFE: And I'm not agreeing, but
17     I understand that's your position --
18     MR. BALS: This --
19     MS. O'KEEFE: -- and I will -- if you
20     want to take a break right now, I can go see
21     if I can get that in the works immediately so
22     that we can avoid having to bring him back.
23     MR. BALS: Why don't we do that. But I
24     want to say one other thing on the record and
25     we can talk about that more.
```

**41**

1  Q. Okay. Was -- were you being represented, you
2     personally being represented by Christopher
3     Branson in December of 2006?
4  A. I have a relationship with Christopher Branson
5     that goes back to 2002. So the businesses and my
6     wife, my kids. So in 2006, yeah.
7  Q. Okay. So I just want to be clear of your answer
8     because -- were you personally being represented
9     by Christopher Branson in December of 2006?
10    MS. O'KEEFE: I'm going to object --
11 A. I think --
12    MS. O'KEEFE: -- on the grounds of it --
13    it's calling for a legal conclusion in terms
14    of who is the client, so I -- you may answer
15    if you know.
16 A. I think I answered it. So Chris Branson
17    represented my wife, myself, some businesses and
18    both of my children.
19 Q. In December of 2006?
20 A. Correct.
21 Q. You said -- do you know whether Mr. Branson
22    played some role in deciding to create Jenis
23    Holding Company, LLC?
24    MS. O'KEEFE: I'm going to object to the
25    extent that that calls for any attorney/

**42**

1     client privilege communications.
2     Otherwise you may answer the factual
3     question of whether he was involved in this.
4  A. You know, the -- the document speaks for itself.
5     I mean, it shows him as the -- as the mailing
6     address.
7  Q. The -- looking back at Exhibit No. 17 and -- I
8     would like to ask you this question. You -- you
9     indicated in your earlier testimony that the
10    lawyers made the decisions on what companies
11    would be created. Do you recall that?
12 A. I --
13    MS. O'KEEFE: Objection. Mis --
14 Q. Was that correct? Is that your -- is that your
15    testimony?
16 A. The lawyers on the needs for the corporations and
17    how to structure these deals, yes.
18 Q. All right. So if the lawyers made those
19    decisions, how do you know that it was a mistake
20    that you were listed as a member on Halle'
21    Exhibit 17?
22 A. Because the compliance officer at the time was
23    Mark Sullivan and Mark was prone to mistakes, but
24    I -- you know, I mean, as I testified before, I
25    never owned any stock in Jenis Holdings, period,

**43**

1     end of story. Never at any time.
2  Q. How -- well, you know you were listed as a
3     member.
4  A. It -- you know, it --
5     MS. O'KEEFE: Hold on. There is not a
6     question pending.
7     MR. BALS: Well, that was a question.
8  Q. You are with -- you agree with me you were listed
9     as a member on this document filed in the New
10    Hampshire secretary -- with the New Hampshire
11    Secretary of State, correct?
12 A. That's what --
13    MS. O'KEEFE: Objection to form and
14    foundation.
15 A. That's what the -- the -- that the filing says,
16    but it's not -- it's not correct.
17 Q. How do you know that's not correct if it was --
18 A. Because I --
19 Q. Let me just finish my question.
20 A. Okay.
21 Q. How do you know it's not correct if it was up to
22    the lawyers to decide how the companies were
23    going to be formed and who was going to be part
24    of them?
25    MS. O'KEEFE: Objection. Argumentative.

**44**

1  A. Then we should bring the attorneys to think --
2     to -- to discuss it, but I can tell you --
3     MS. O'KEEFE: No. No. We -- absolutely
4     not. We are not waiving any attorney/client
5     privilege.
6  Q. Well --
7  A. Just -- here is my testimony. I have never held
8     any shares in Jenis Holdings, period, end of
9     story, so --
10 Q. And how are you so sure of that?
11 A. Because I'm sure of that.
12    MS. O'KEEFE: Objection. Asked and
13    answered. Argumentative.
14    MR. BALS: I don't think it's been
15    answered. I don't think I'm getting an
16    answer to the question, so I'm going to keep
17    asking it until I get an answer.
18 A. Okay.
19 Q. All right. You say I never have. Why are you so
20    sure you -- that -- I mean, if the lawyers made
21    the decision, why wouldn't the lawyer have said
22    maybe you're going to own this one? How do you
23    know that that wouldn't be the case?
24 A. Because I --
25    MS. O'KEEFE: Objection. I think that

45

1     misstates his testimony from earlier.
2 A. I'm just sure. I'm --
3 Q. What makes you so sure? That's what I'm trying
4     to find out.
5 A. Just --
6        MS. O'KEEFE: The same objection.
7     Argumentative.
8 A. -- I'm sure. I don't know how else to answer the
9     question. I'm not trying to be argumentative
10    with you. I'm just -- I can tell you for a fact
11    that I've never held shares in Jenis Holdings.
12 Q. Well, it's a membership to begin -- I mean, it's
13    an LLC to begin with.
14 A. Well, units if you would like to -- to
15    characterize it better.
16 Q. Now, you say that one of the reasons you believe
17    there was a mistake was Mr. Sullivan was prone to
18    mistakes?
19 A. Mr. Sullivan -- Mr. Sullivan handled all the
20    annual reports and the quality control on that
21    was always -- was never the best.
22 Q. Who was actually running -- I mean managing and
23    running Jenis Holding Company, LLC?
24 A. Jenis Holdings Company, LLC, if you take a look
25    at the second word, it says holding, meaning it

46

1     has no employees. It's just a shell where assets
2     are parked.
3 Q. All right. But you know that your wife Sharon is
4     listed as manager on the annual reports for Jenis
5     Holding Company, LLC, correct?
6 A. Correct.
7 Q. And did she have some management
8     responsibilities?
9 A. So I -- you know, are you asking me whether she
10    changed the tires on the car that we own or did
11    she refill the car -- does she pay for the
12    insurance, did she file, you know, the
13    registration? You know, that's nonsensical. I
14    mean, Jenis Holdings is a holding corporation.
15    That's the second word in Jenis Holdings. It has
16    no employees and it holds assets. So the
17    manager -- you know, short of changing the wipers
18    and putting gas in the -- in the tank there is no
19    other -- there is nothing else to do.
20 Q. Didn't Jenis Holding Company, LLC also pay some
21    property taxes for some property up here in
22    Maine?
23 A. I think that Jenis might have paid for -- Jenis
24    Realty would have paid taxes for a property in
25    Auburn.

47

1 Q. All right. Well, I'm not -- I'm talking about
2     Jenis Holding Company at the moment.
3 A. Yes.
4 Q. Are you aware that Jenis Holding Company, LLC
5     would have been paying property tax on property I
6     think it was in Scarborough?
7 A. We don't have any property in Scarborough.
8 Q. Did you ever?
9 A. We have 16 Hunter Point Drive in Scarborough.
10 Q. I'm sorry?
11 A. 16 Hunter Point Drive. That's the only real
12    estate that we owned in --
13 Q. When did you own that real estate?
14 A. Sharon owned that from 2006 to a couple of months
15    ago.
16 Q. All right. And did Jenis Holding Company, LLC to
17    your knowledge ever pay property tax for that
18    property?
19 A. Not to my knowledge.
20 Q. If I were to represent to you that it did, would
21    that come as a surprise to you?
22 A. Absolutely, yes.
23 Q. Why would that be a surprise to you?
24 A. Because, you know, Jenis Holdings didn't --
25    didn't own the property.

48

1 Q. Do you know --
2       MR. BALS: Do we have that document?
3       MS. CLEGG: I'm looking for it.
4 Q. Did Mr. Sullivan, to your knowledge, have an
5     ownership interest in Jenis Holding Company, LLC?
6     And I'm not talking about him as lawyer. As --
7     did he have some ownership interest in it?
8 A. No, he did not.
9 Q. And from your -- from Exhibit 17 he was -- he
10    apparently was the registered agent in New
11    Hampshire, correct?
12 A. Correct.
13 Q. Was there a compliance officer for Jenis Holding
14    Company, LLC?
15 A. So as -- as we acquired compliance officers,
16    then -- then there would have been one that would
17    have been involved in -- in making sure that we
18    were in compliance.
19 Q. Was -- okay. Who was the compliance officer for
20    Jenis Holding Company, LLC?
21 A. So --
22       MS. O'KEEFE: Objection to form.
23       You may answer.
24 A. So the -- the compliance officer at Cate Street
25    is the one that looks at all of the companies and

## Page 73

| | | |
|---|---|---|
| 1 | | MS. O'KEEFE: Okay. Let's do it. |
| 2 | | VIDEOGRAPHER: The time is 10:41. We're |
| 3 | | off the record. |
| 4 | | (A short recess was taken.) |
| 5 | Q. | Just a couple other questions about -- |
| 6 | | VIDEOGRAPHER: I'm sorry. |
| 7 | | MR. BALS: Oh, I'm sorry. |
| 8 | | VIDEOGRAPHER: The time is 10:58. We're |
| 9 | | back on the record. |
| 10 | Q. | Do you remember there was litigation in New York |
| 11 | | that you were involved with Mr. Davimos, correct? |
| 12 | A. | Correct. Yeah. |
| 13 | Q. | Do you remember there was a time when Mr. Davimos |
| 14 | | won a summary judgment motion in that case? |
| 15 | A. | Which case? |
| 16 | Q. | The litigation -- the litigation that resulted in |
| 17 | | the judgment that my client is trying to collect |
| 18 | | now. |
| 19 | A. | Okay. |
| 20 | Q. | Do you recall the summary judgment being issued? |
| 21 | A. | No. |
| 22 | Q. | No. You don't remember that? |
| 23 | A. | No. This -- you know, you're talking about 13 |
| 24 | | years worth of litigation my friend. |
| 25 | Q. | Well, I'm not talking about 13 years ago. |

## Page 74

| | | |
|---|---|---|
| 1 | A. | Yeah. |
| 2 | Q. | So -- I'm just recalling -- I mean, there was a |
| 3 | | summary judgment, went up on appeal, reversed, |
| 4 | | sent back down. Do you recall any of that? |
| 5 | A. | My memory generally, yeah. |
| 6 | Q. | Okay. Then I'm not going to ask you about it |
| 7 | | right now. |
| 8 | A. | All right. |
| 9 | Q. | What I would like you to do is take another look |
| 10 | | at the complaint, which is Exhibit 2. |
| 11 | A. | I need my glasses. |
| 12 | Q. | And if you could take a look at Page 3 of Exhibit |
| 13 | | 2. And I'm at Paragraph 16. Paragraph -- are |
| 14 | | you there? |
| 15 | A. | Yes. |
| 16 | Q. | It says -- the allegation there in the complaint |
| 17 | | is on May 17, 2005 defendants John Halle' and |
| 18 | | Sharon Halle' purchased real estate located at |
| 19 | | 106 Woodlands Drive, Falmouth, Maine. Do you see |
| 20 | | that? |
| 21 | A. | Yes. |
| 22 | Q. | Now, that -- that is admitted in the answer that |
| 23 | | your lawyer filed on your behalf and that's a |
| 24 | | true fact, correct? You did purchase that real |
| 25 | | estate with your wife, right? |

## Page 75

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | | MS. O'KEEFE: Objection. Foundation. |
| 3 | Q. | Well -- |
| 4 | | MS. O'KEEFE: Form. |
| 5 | Q. | -- do you know if you purchased that real estate? |
| 6 | A. | Yes. |
| 7 | Q. | Okay. And what was the purchase price? |
| 8 | A. | I don't recall, but -- I don't recall. I -- I |
| 9 | | think those documents are around here somewhere. |
| 10 | Q. | Where did the money come from to purchase the |
| 11 | | real estate? |
| 12 | A. | I think we borrowed it. |
| 13 | Q. | Did you have any money that you put down? |
| 14 | A. | Probably 120, something like that. 120,000. |
| 15 | Q. | Where did the $120,000 come from that was put |
| 16 | | down on the purchase of the property? |
| 17 | A. | I don't recall that, but I think I can fairly |
| 18 | | easily find that out too. |
| 19 | Q. | Okay. So when you say you don't recall it, are |
| 20 | | you -- is your testimony that you don't know |
| 21 | | the source of the monies that were used to pay |
| 22 | | the -- the down payment on the purchase of the |
| 23 | | property? |
| 24 | A. | Not in -- |
| 25 | | MS. O'KEEFE: Objection to form. |

## Page 76

| | | |
|---|---|---|
| 1 | A. | Not in a definitive answer that would satisfy you |
| 2 | | or would, you know, be accurate. |
| 3 | Q. | Okay. |
| 4 | A. | I like to be accurate, so -- you know, I can find |
| 5 | | that out. So she is taking a list and we'll find |
| 6 | | that out for you. |
| 7 | Q. | All right. |
| 8 | | MR. BALS: Do you believe that all |
| 9 | | those -- the documents associated with the |
| 10 | | property have been produced, Margaret? |
| 11 | | MS. O'KEEFE: I believe they have, but |
| 12 | | I -- you obviously are asking some additional |
| 13 | | questions here that might be answered by |
| 14 | | documents we haven't produced and we are |
| 15 | | happy to track those down for you. |
| 16 | Q. | If you look at Paragraph 17 of the complaint. |
| 17 | A. | Yeah. |
| 18 | Q. | That -- Paragraph 17 alleges that on September |
| 19 | | 15th, 2005 defendants John Halle' and Sharon |
| 20 | | Halle' transferred the real estate located at 106 |
| 21 | | Woodlands Drive, Falmouth, Maine to Sharon Halle' |
| 22 | | for no consideration as evidenced on the Maine |
| 23 | | Revenue Services Real Estate Transfer Tax |
| 24 | | Declaration pertaining to the transaction. Do |
| 25 | | you see where I -- where I'm reading from? |

Page 77

1  A. Yeah. 17, right?
2  Q. All right. Do you recall a time in September of
3     2005 where you transferred your interest in the
4     106 Woodlands Drive property to your wife Sharon?
5  A. Yes.
6  Q. Why did you do that?
7  A. So for estate planning. I'm a Canadian national,
8     so in the event of my death. You know, a U.S.
9     national pays -- has no -- there is no floor on
10    the -- on the taxes. So everything that's
11    transferred from a Canadian national to a U.S.
12    national upon his death there are no exemptions.
13    So for tax reasons -- you know, for estate
14    planning and tax reasons if I didn't do that and
15    I passed on, then my wife would be -- had --
16    would have to pay taxes on -- on a house where
17    there is little equity and -- and so on and so
18    on. So it was a -- and by the way, my brothers
19    have done that and -- and that's a -- you know, a
20    common thing.
21 Q. Why did you purchase it jointly to begin with?
22 A. Because I didn't know that then.
23 Q. Okay. So your -- your testimony is at some -- at
24    some point between May of 2005 and September of
25    2005 you learned that?

Page 78

1  A. Correct.
2  Q. Okay. I don't -- I want to -- well, let me just
3     ask you.
4        Were you consulting with someone about that
5     issue?
6  A. So my father is also --
7  Q. Just --
8  A. So yes.
9  Q. I'm going to interrupt; and I apologize, but I
10    want to be careful that you don't run afoul of a
11    privilege issues here, at least for the time
12    being. So my question is trying to be discrete
13    here.
14       Were you consulting with someone about this
15    Canadian tax issue?
16 A. The answer is yes.
17 Q. Who?
18 A. My father.
19 Q. Okay. And what is your father's -- your father's
20    name?
21 A. Roland Halle'.
22 Q. Where does Roland Halle' reside?
23 A. Roland resides in Canada.
24 Q. Okay. And what -- tell me about your discussions
25    with Roland Halle'.

Page 79

1  A. So my father lived in the States, just like we
2     did, and he discovered this thing too. My father
3     was getting on in age, 78 years old, and he
4     discovered that issue through I think his tax
5     accountant or his tax attorney and notified the
6     kids that, you know, that's an issue. And so
7     when I found out -- I found out about that,
8     that's when I transferred the real estate to
9     Sharon.
10 Q. When did he notify you?
11 A. Plus or minus around that time.
12 Q. How did he notify you?
13 A. He called -- I think he either called me or --
14    you know, I get along with my father fairly well,
15    so either at dinner at my house or at his house,
16    you know.
17 Q. Would there have been any correspondence from --
18    with your father about this issue?
19 A. No, I don't think -- you know, my father is in
20    his 80s. You know, e-mails is not something that
21    he's used to.
22 Q. At the time of this transfer from you to Sharon
23    what provision, if any, did you make for your
24    creditors?
25 A. What creditors did I have?

Page 80

1        MS. O'KEEFE: Objection.
2  Q. Did you have any?
3  A. Not to my knowledge.
4  Q. So your testimony is you didn't believe you had
5     any creditors at that time?
6  A. Correct.
7  Q. Were you aware at that time that Mr. Davimos was
8     making a claim against you?
9  A. Correct.
10 Q. Okay. And what provision when you -- at the time
11    that you transferred your equity in the home to
12    Sharon did you make for Mr. Davimos?
13       MS. O'KEEFE: Objection. Foundation.
14    Asked and answered.
15       MR. BALS: I don't think I asked that
16    question before.
17       MS. O'KEEFE: You asked what provision
18    did you make for any creditors at the time of
19    your transfers and he answered that question.
20       MR. BALS: For -- I don't -- I think I
21    was asking specifically about Mr. Davimos.
22 Q. So my question is what provision did you make for
23    Davimos?
24 A. I didn't have any liability to Mr. Davimos.
25 Q. Okay. There has been a stipulation in this case