# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD DAVIMOS, JR., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13-CV-0225 (GZS) |
| | ) | |
| JOHN HALLÉ, et al., | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANTS' MOTION *IN LIMINE* TO ADUCE EVIDENCE OF THE PLAINTIFF'S PRIOR BAD ACTS UNDER FED R. EVID 608(b)

Defendants John Hallé and Sharon Hallé hereby move *in limine* for an Order permitting them to cross-examine the Plaintiff regarding the alleged perjury he committed in obtaining the New York Judgment. In particular, it is the Defendants' position that Mr. Davimos testified falsely in the underlying New York Supreme Court trial that he relied exclusively on John Hallé to guide him through the relevant transaction, whereas billing statements from his attorneys prove that he had numerous discussions with his counsel regarding the same. In light of these facts, the Defendants should be allowed to cross examine Mr. Davimos regarding his alleged perjury in the underlying lawsuit against Mr. Hallé for the purpose of challenging his credibility as a witness in this matter. Fed R. Evid. 608(b).

## RELEVANT FACTUAL BACKGROUND

Mr. Davimos and Mr. Hallé met in 1998. Mr. Davimos' father was one of the founders of American Express and Lehman Brothers, and had connections to a number of financiers. In the late 1990s into the early 2000s, Mr. Davimos worked with Mr. Hallé on a number of entertainment related deals. One of the deals involved a proposal to finance several movies to be

produced by Total Film Group ("TFG"). Mr. Davimos introduced Mr. Hallé to TFG, and secured a proposal from Lehman for it to finance a slate of films to be produced by TFG.

Lehman's proposed financing consisted of its offering bonds to be backed by the slate of films proposed for production by TFG, and was dependent upon the issuance by Frontier Insurance of an insurance policy that would protect the bond investors. Just prior to the financial close of Lehman's proposed bond offering, Frontier Insurance failed to report its financial results. The failure led to the market to downgrade substantially the company's rating. Absent the reliable backing of Frontier, Lehman retracted its support for TFG's project.

Once Lehman withdrew its proposed bond offering, Mr. Davimos agreed to personally raise $2 million dollars from his father to be lent to TFG. At the suggestion of his brother, Mr. Davimos then hired Henry Holmes, Esq., a premier entertainment lawyer, to represent him in the proposed loan to TFG. Gerald Green, the chief executive officer of TFG, sent Henry Holmes, Esq. a letter from a pecuniary loss insurer in which the insurance company explained that, although the pecuniary loss insurance coverage was in place, the policy itself had not been issued because a minor player was refusing to subordinate its position to the screen actors' guild in the collection agreement that prioritizes payments from the movie's revenue.

Mr. Davimos approached John Hallé about providing a guarantee of half the proposed loan, and explained that he wanted Mr. Hallé's guarantee because he, Mr. Davimos, wanted Mr. Hallé to have an incentive to assure the pecuniary loss policy was in place. On December 20, 1999, Mr. Hallé executed a guarantee "for prompt payment of One Million Dollars ($1,000,000) of the Two Million Dollars ($2,000,000) due on December 17, 2001 under that certain promissory note dated December 17, 1999 ("Note"), executed by the Company in favor of Mr. Davimos."

At about the same time as Mr. Davimos asked John Hallé for his guarantee of half the loan, Mr. Davimos asked Attorney Holmes to review the underlying loan and other terms. In a letter dated November 21, 1999, Holmes advised Mr. Davimos not to complete the December 17, 1999 loan, and to instead negotiate the terms of a new deal.

At no time did Mr. Davimos loan the $2 million dollars. Instead, He agreed to loan TFG a lesser amount and there was never a "certain promissory note dated December 17, 1999" executed by TFG.  A proposed promissory note with revisions and suggested changes was drafted, and negotiations relative to those documents continued over the next several months. On January 20, 2000, Mr. Davimos' attorney sent blank UCC statements to Green to be executed by Green on behalf of TFG, and the blank UCC statements were used to secure Davimos' loan against TFG's assets.

Davimos' attorneys supplied Mr. Hallé with a revised guarantee to sign, but Mr. Hallé refused to sign the revised guarantee because the new guarantee had materially different terms than those contained in the loan documentation that had been drafted as of December 17, 1999. By the time Davimos' attorneys presented John Hallé with the revised guarantee, the pecuniary loss policy was already in place.

In August, 2000, Mr. Hallé asked TFG's attorneys to provide him with all the documentation pertaining to the funding of the movie My First Mister. On August 11, 2000, TFG provided Mr. Hallé with the documentation supporting the funding of My First Mister, which included an unsigned loan and security agreement dated January 1, 2000 between My 1st Mr. Inc. and Davimos. There was no mention by TFG's counsel of a guarantee relative to the financing. By letter dated December 27, 2000, Green conveyed a document stating that the loan and

3

security agreement between My 1st Mr., Inc. and Richard Davimos, Jr. as of January 1, 2000 is the final, binding agreement.

My First Mister was released in early 2001, and 1st Mister Inc. was in default of its obligation to pay interest from the first payment due in June, 2000. Davimos made no effort to hold TFG accountable for its failure to make its interest payments and repay its loan to him. Instead, Davimos demanded payment from John Hallé under the guarantee of the December 17, 1999 loan (which was never made). John Hallé pointed out to the attorneys that their representations concerning a note dated December 17, 1999 were unfounded and that no such note had ever been executed.

Mr. Davimos filed suit in the Supreme Court of New York in 2002. At trial, Mr. Davimos argued there was a single unified transaction and that he relied exclusively on Mr. Hallé to counsel and guide him through negotiating the $1 million dollar loan. Mr. Davimos testified at trial that he knew "exactly what John Hallé told me" about the deal, and nothing else. *See* Trial Testimony of Richard Davimos, Jr. at Tr. 47-51, *Richard Davimos, Jr. v. John Hallé*, Supreme Court of the State of New York Index No. 11103/02, attached hereto as **Exhibit A**. When asked about the information he learned from counsel about the deal, he went on to say that he knew "nothing" from his lawyers. (*Id.*) Relying on this testimony, the trial court ultimately found for Mr. Davimos.

Defendants contend that Mr. Davimos' testimony was false. Billing records prove that Mr. Davimos retained a preeminent entertainment lawyer to negotiate the loan documents without Mr. Hallé's input, and that Mr. Davimos had multiple conversations and communications with his attorneys. *See Billing Statements of Weissmann, Wolff, Bergman, Coleman & Silverman, LLP*, attached hereto as **Exhibit B**. Unfortunately, these documents were

4

not offered at trial to the New York Supreme Court to impeach Mr. Davimos' testimony. As a result of the alleged perjury, Mr. Davimos is now a judgment creditor of Mr. Hallé.

## ARGUMENT

The Defendants should be permitted to examine Mr. Davimos about his character for untruthfulness under Fed. R. Civ. P. 608(b). Rule 608(b)[1] grants the Court discretion to permit cross-examination of a witness as to specific instances of conduct relating to a witness's character for truthfulness or untruthfulness. The rule "[a]dresses situations in which a witness's prior activity, whether exemplified by conduct or by a statement, in and of itself casts significant doubt upon his veracity." *United States v. Winchenbach*, 197 F.3d 548, 560 (1st Cir. 1999). "Acts probative of untruthfulness under Rule 608(b) include such acts as forgery, perjury, and fraud." *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*, 37 F.3d 1460, 1464 (11th Cir. Fla.1994)(citing 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*, 608[5] at 608-45 to 608-46 (1994)).

Under the facts above, the Court could conclude that Mr. Davimos previously offered false testimony against John Hallé, and the Defendants should be entitled to inquire into the circumstances of the alleged perjury to allow the factfinder to decide whether he is doing so

---

[1] Fed. R. Evid. 608 provides:

> **(a) Reputation or Opinion Evidence.** A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

> **(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
> > **(1)** the witness; or
> > **(2)** another witness whose character the witness being cross-examined has testified about.
> By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

again. Mr. Davimos' testimony will be relevant at least as to the issue of the statute of limitations, placing his credibility at issue. 14 M.R.S. § 3580(1)(statute of repose in Maine); RSA 545-A:9(I)(statute of respose in New Hampshire). Thus, to prevent the Court here from concluding some or all of the claims are time barred, the factfinder could properly consider whether Mr. Davimos is offering false testimony regarding his actual knowledge of the transfers in question to preserve the claim. His character for truthfulness is therefore an issue in the case, subject to question under Fed. R. Evid. 608.

The proffered line of question is appropriate under Rule 403 because the evidence of the alleged perjury is highly probative of character for truthfulness, and far exceeds the risk of unfair prejudice. Courts have held that allegations of perjury are highly probative on the value of a witness' testimony. *See generally United States v. De La Torre*, 639 F.2d 245, 249 (5th Cir. 1981)("Clearly crimes involving dishonesty, such as perjury, are extremely probative of a witness's credibility."); *United States v. Lundy*, 416 F. Supp. 2d 325 (E.D. Pa.2005)(concluding that a prior perjury charge, although ultimately dismissed, "goes directly to [the witnesses]'s credibility and involves an instance where the [witness] lied, which is the classic example of a permissible inquiry" under Rule 608(b)).[2] The probative value of Mr. Davimos' conduct is further bolstered under the facts of this case because, not only is the proffered evidence an act of alleged perjury, but an act of alleged perjury that was committed in Mr. Davimos' previous against Mr. Hallé. The evidence is therefore probative of Mr. Davimos' alleged intent to deceive the courts into imposing liability against Mr. Hallé, as retribution for Mr. Hallé's decision to cease doing business with Mr. Davimos. On the other hand, the risk of unfair prejudice is low.

---

[2] Mr. Davimos may point out that he was never charged or convicted of perjury. This response would not be on point. The proposed line of questioning would address a specific instance of conduct where Mr. Davimos lied while under oath in court against Mr. Hallé. As such, Mr. Davimos' perjury represents a specific instance of conduct that is "probative of the character for truthfulness or untruthfulness" of the witness. Fed. R. Civ. P. 608(b).

This case is scheduled for a bench trial, so there is no risk that the factfinder will erroneously consider the evidence for reasons other than credibility. In light of these factors, any claim that the probative value of the evidence is substantially outweighed by the risk of prejudice should be rejected.

## CONCLUSION

For the reasons set forth above, this Court should enter an order *in limine* permitting the Defendants to question Mr. Davimos during his trial testimony about his the alleged perjury in the New York Supreme Court.

Dated:  October 29, 2014

_/s/ Brian L. Champion_____
Brian L. Champion, Bar #3765
Tyler J. Smith, Bar #4526
Libby O'Brien Kingsley & Champion, LLC
62 Portland Road, Suite 17
Kennebunk, ME 04043
Tel:  (207) 985-1815
E-mail:    bchampion@lokllc.com
Attorney for the Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which caused a copy of this document to be served electronically on all registered counsel of record:

Lee H. Bals, Esq.
Marcus Clegg Mistretta, P.A.
One Canal Plaza, Suite 600
Portland, ME  04101-4035

Dated:  October 29, 2014                    /s/ Brian L. Champion_____
Brian L. Champion, Bar #3765
Tyler J. Smith, Bar #4526
Libby O'Brien Kingsley & Champion, LLC
62 Portland Road, Suite 17
Kennebunk, ME 04043
Tel:  (207) 985-1815
E-mail:   bchampion@lokllc.com
Attorney for the Defendants